**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON,** 455 Massachusetts Ave., N.W. Washington, DC  20001, <br><br>**NOAH BOOKBINDER** 10206 Brookmoor Dr. Silver Spring, MD  20901, <br><br>Plaintiffs, <br><br>v. <br><br>**FEDERAL ELECTION COMMISSION** 1050 First St., N.E. Washington, DC  20463, <br><br>Defendant. | Civil Action No. 18-1861 |

**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

1. This is an action for injunctive and declaratory relief under the Federal Election Campaign Act of 1971 ("FECA" or "the Act"), 52 U.S.C. § 30109(a)(8)(A), challenging the Federal Election Commission's ("FEC" or "Commission") failure to act on an administrative complaint and amended complaint by Citizens for Responsibility and Ethics in Washington ("CREW") and Noah Bookbinder (collectively "Plaintiffs") against Americans for Job Security ("AJS") and Stephen DeMaura, individually and in his capacity as Treasurer of AJS (collectively "Respondents"), for violating the FECA by failing to register as a political committee and file disclosure statements as required of political committees, despite meeting the requirements of and acting as a political committee. Plaintiffs filed the initial administrative complaint on March 8, 2012, and following extensive litigation, the action was remanded to the FEC, where Plaintiffs' filed an amended administrative complaint on March 20, 2018. The FEC has failed to

resolve the original administrative complaint, filed over six years ago, and failed to act on the amended administrative complaint, filed more than 120 days ago.

## JURISDICTION AND VENUE

2.       This Court has both subject matter jurisdiction over this action and personal jurisdiction over the parties pursuant to 52 U.S.C. § 30109(a)(8)(A) and 5 U.S.C. § 702. This Court also has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 2201(a), and 2202. Venue lies in this district under 52 U.S.C. § 30109(a)(8)(A) and 28 U.S.C. § 1391(e).

## PARTIES

3.       Plaintiff CREW is a non-profit, non-partisan corporation organized under section 501(c)(3) of the Internal Revenue Code.

4.       CREW is committed to protecting the right of citizens to be informed about the activities of government officials, ensuring the integrity of government officials, protecting our political system against corruption, and reducing the influence of money in politics. CREW works to advance reforms in the areas of campaign finance, lobbying, ethics, and transparency. Further, CREW seeks to ensure that campaign finance laws are properly interpreted, enforced, and implemented.

5.       To advance its mission, CREW uses a combination of research, litigation, advocacy, and public education to disseminate information to the public about public officials and their actions, and the outside influences that have been brought to bear on those actions. A core part of this work is examining and exposing the special interests that have influenced our elections and elected officials and using that information to educate voters regarding the integrity of public officials, candidates for public office, the electoral process, and our system of government.

6. Toward this end, CREW monitors the activities of those who run for federal office as well as those groups financially supporting candidates for office or advocating for or against their election. CREW regularly reviews campaign finance reports that groups, candidates, and political parties file with the FEC disclosing their expenditures and, in some cases, their contributors. Using the information in those reports, CREW, through its website, press releases, reports, and other methods of distribution, publicizes the role of these individuals and entities in the electoral process and the extent to which they have violated federal campaign finance laws.

7. CREW also files complaints with the FEC when it discovers violations of the FECA. Publicizing violations of the FECA and filing complaints with the FEC serve CREW's mission of keeping the public, and voters in particular, informed about individuals and entities that violate campaign finance laws and deterring future violations of campaign finance laws.

8. CREW is hindered in carrying out its core programmatic activities when those individuals and entities that attempt to influence elections and elected officials are able to keep their identities hidden. Likewise, the FEC's refusal to properly administer the campaign finance laws, particularly the FECA's reporting requirements, hinders CREW in its programmatic activity, as compliance with those reporting requirements often provides CREW with the only source of information about those individuals and groups funding the political process. As a result of the FEC's refusal to enforce the FECA, organizations and individuals are able to launder their contributions through third parties. This deprives CREW of information critical to advancing its ongoing mission of educating the public to ensure the public continues to have a vital voice in our political process and government decisions.

9. A part of CREW's work in carrying out its central mission CREW focuses on so-called "pay-to-play" schemes. Toward that end, CREW looks for correlations between donations

to the campaign of a member of Congress or candidate and that member's subsequent congressional activities, including advocating for policies and legislation that serve the interests of the member's donors. Information that an individual or entity made a large-dollar contribution may be very revealing about the influences that donor has brought to bear on the member post-election. Without information about the individuals and entities funding the political activities of organizations and individuals, CREW is stymied in fulfilling its central mission.

10. As an example, in May 2015, CREW issued a report, *Welcome to Washington: New Members of Congress Attract Special Interest Money,* that analyzed fundraising by newly elected members of Congress in their first year in office. CREW's analysis was based on FEC campaign contribution records that identified contributions to those members from special interest PACs, including PACs tied to corporations, unions, and issues groups. From this data, CREW determined that new members of the House of Representatives embraced fundraising from special interests after they took office and became more reliant on that money than they had been as candidates. Those members raised nearly $17.3 million from special interest PACs in 2015, an increase of 15.8% over the amount they raised as candidates during the entire 2014 election cycle. CREW further found that special interest PAC money accounted for an average of 37.6% of total funds raised by the new members in 2015, more than double the 17.3% rate from the 2014 election cycle. CREW was able to obtain this information because of the disclosure requirements to which the organizations receiving those contributions – federal candidates, party committees, PACs, and super PACs – are subject under the FECA.

11. As another example, on August 21, 2017, CREW published a blog post entitled *Synchronized Spending: The Dark Money Phantom's New Illusion*, which highlighted section 501(c)(4) dark money nonprofits that fully fund multiple federal super PACs that attack or

4

support the same candidates. By making the work of one group appear to be the work of two independent groups, this tactic misleads the public, exaggerates candidates' outside support, and exacerbates the problems caused by secret money in politics. CREW obtained the information used in this post from information the FECA requires political committees to disclose.

12.     Plaintiff Noah Bookbinder is the executive director of CREW. He is a citizen of the United States and a registered voter and resident of the state of Maryland. As a registered voter, Mr. Bookbinder is entitled to receive all the information the FECA requires those engaged in political activities to report publicly. He is further entitled to the FEC's proper administration of the provisions of the FECA. Mr. Bookbinder is harmed in exercising his right to an informed vote when a political committee fails to report the true source of its contributions, as the FECA requires.

13.     When Plaintiffs file complaints against violators of the FECA, they rely on the FEC, as the preliminary civil enforcement authority, to comply strictly with the FECA when making its investigative and enforcement decisions. *See* 52 U.S.C. § 30107(e). Plaintiffs are harmed and are "aggrieved" parties when the FEC refuses to act on meritorious complaints, refuses to enforce the FECA's mandatory disclosure requirements, or otherwise acts contrary to the requirements of the FECA. *See* 52 U.S.C. § 30109(a)(8)(C).

14.     Defendant FEC is the federal agency established by Congress to oversee the administration and civil enforcement of the FECA. *See* 52 U.S.C. §§ 30106, 30106(b)(l).

## STATUTORY AND REGULATORY BACKGROUND

15.     The FECA and the implementing FEC regulations impose on "political committees" registration, organization, and disclosure requirements.

16. The FECA and implementing FEC regulations define a "political committee" as "any committee, club, association, or other group of persons which receives contributions aggregating in excess of $1,000 during a calendar year or which makes expenditures aggregating in excess of $1,000 during a calendar year." 52 U.S.C. § 30101(4)(A); 11 C.F.R. § 100.5(a).

17. The FECA defines an "expenditure" as "any purchase, payment, distribution, loan, advance, deposit, or gift of money or anything of value, made by any person for the purpose of influencing any election for Federal office." 52 U.S.C. § 30101(9)(A). The Supreme Court has clarified that an "expenditure" for the purpose of this definition includes only "funds used for communications that expressly advocate the election or defeat of a clearly identified candidate." *See Buckley v. Valeo*, 424 U.S. 1, 80 (1976).

18. In *Buckley*, the Court carved out from the reach of the FECA's political committee provisions groups that, while they met the statutory definition, were neither under the control of a candidate nor had the requisite "major purpose" to nominate or elect of federal candidates. *See* 424 U.S. at 79.

19. An organization's major purpose may be demonstrated by its activities, and a group that devotes a sufficiently extensive amount of its spending to campaign activity may be subjected to the FECA's political committee provisions. *See FEC v. Mass. Citizens for Life, Inc.*, 479 U.S. 238, 262 (1986).

20. Under the FECA, any person who believes there has been a violation of the Act may file a sworn complaint with the FEC. 52 U.S.C. § 30109(a)(l). Based on the complaint, the response from the person or entity alleged to have violated the Act, facts developed by the Office of General Counsel ("OGC"), and any OGC recommendation, the FEC decides whether there is "reason to believe" a violation of the FECA has occurred. 52 U.S.C. § 30109(a)(2).

21.     A "reason to believe" exists where a complaint "credibly alleges" a violation of the FECA "may have occurred." FEC, Statement of Policy Regarding Commission Action in Matters at the Initial Stage in the Enforcement Process, 72 Fed. Reg. 12545 (Mar. 16, 2007). If four commissioners find there is "reason to believe" a violation of the FECA has occurred, the FEC must notify the respondents of that finding and "shall make an investigation of such alleged violation." 52 U.S.C. § 30109(a)(2).

22.     The FECA and FEC regulations require all political committees to register with the FEC within 10 days of becoming a political committee. 52 U.S.C. § 30103(a); 11 C.F.R. § 102.1.

23.     Further, under the FECA and implementing FEC regulations, political committees must file periodic reports with the FEC that, among other things: (1) identify all individuals contributing an aggregate of more than $200 in a year to the organization, and the amount each individual contributed; (2) identify all political committees making a contribution to the organization, and the amount each committee contributed; (3) detail all of the organization's outstanding debts and obligations; and (4) list all of the organization's expenditures, including its independent expenditures and electioneering communications. 52 U.S.C. § 30104(a)(4), (b), (f)(2); 11 C.F.R. §§ 104.3, 104.4, 104.20(b).

24.     Under the FECA, any person who believes there has been a violation of the Act may file a sworn complaint with the FEC. 52 U.S.C. § 30109(a)(l). Based on the complaint, the response from the person or entity alleged to have violated the Act, facts developed by the Office of General Counsel ("OGC"), and any OGC recommendation, the FEC decides whether there is "reason to believe" a violation of the FECA has occurred. 52 U.S.C. § 30109(a)(2).

25.     The district court reviewing the FEC's dismissal of a complaint may declare the

FEC's actions "contrary to law." 52 U.S.C. § 30109(a)(8)(C). The court also may order the FEC "to conform with such declaration within 30 days." *Id.* If the FEC fails to abide by the court's order, the FECA provides the complainant with a private right of action, brought in the complainant's own name, "to remedy the violation involved in the original complaint." *Id.*

## FACTUAL BACKGROUND

26. The Alexandria, Virginia-based organization Americans for Job Security ("AJS") formed in 1997 and is a tax-exempt organization organized under section 501(c)(6) of the Internal Revenue Code. Its president and treasurer is Stephen DeMaura.

27. AJS describes itself as an "independent, bi-partisan, pro-business issue advocacy organization," with the chief goal of "educating the public on issues of importance to business, and encouraging a strong job-creating economy that promotes a pro-growth agenda." According to its articles of incorporation, AJS was incorporated for the purpose of uniting "in a common organization businesses, business leaders, entrepreneurs, and associations of businesses" and to "promote the common business interest of its members . . . by helping the American public to better understand public policy issues of interest to business."

28. Between January 15 and October 31, 2010, according to reports AJS filed with the FEC, AJS spent $8,971,043 on independent expenditures and electioneering communications, largely on broadcasting television and Internet advertisements in 20 primary and general elections.

29. AJS reported to the FEC spending $4,414,524 on independent expenditures and $4,556,519 on electioneering communications through October 31, 2010, and $4,908,846 on independent expenditures for calendar year 2010. AJS made no additional electioneering communications in 2010 after October 31, 2010.

30. AJS spent significant sums on about ten versions of electioneering communications covering seven different federal races. For example, AJS spent $479,268 on January 15, 2010, producing and broadcasting an advertisement promoting Scott Brown, then a state senator and the Republican candidate in the January 19, 2010 special election for a U.S. Senate seat in Massachusetts. AJS's advertisement first told viewers that "behind closed doors, Washington decides the future of our health care, with no transparency or accountability. They are slashing Medicare and raising taxes, and only listening to the special interests." AJS then said that "one Massachusetts leader says slow down, get health care right. Scott Brown says protect Medicare, don't raise taxes, listen to the people, not the lobbyists." AJS's advertisement concluded by encouraging voters to "call Scott Brown and tell him you agree Washington should listen to us on health care for a change."

31. From November 1, 2009 through October 31, 2010—AJS's fiscal year—AJS reported to the IRS spending a total of $12,417,809. AJS reported spending only $4,351,478 on political expenditures, less than what AJS reported to the FEC it spent on its independent expenditures alone. Plaintiffs do not possess knowledge sufficient to determine how much of that reported amount to allocate to AJS's political expenses in 2010. Based on the amounts AJS reported to the FEC it spent on independent expenditures and electioneering communications in 2010, the group's combined spending on those political activities for its fiscal year comprised 72.2 percent of its total spending.

32. On March 8, 2012, CREW and Melanie Sloan filed a complaint with the FEC against AJS for violating the FECA ("MUR 6538R"). The complaint alleged that, as demonstrated by its extensive spending on federal campaign activities, AJS's major purpose in 2010 was the nomination or election of federal candidates. As a result, AJS violated the FECA,

52 U.S.C. §§ 30103, 30104, and the relevant implementing FEC regulations.

33. On May 2, 2013, the OGC issued the First General Counsel's Report ("AJS Report") recommending that the Commission find reason to believe that, because AJS had as its major purpose federal campaign activity during 2010, AJS violated 52 U.S.C. § 30102, 30103, and 30104 by failing to organize, register, and report as a political committee. The OGC found AJS spent approximately $4,908,847 in independent expenditures and $4,598,518 on electioneering communications in the 2010 calendar year. The OGC looked to AJS's activities in the 2010 calendar year, rather than the AJS's "entire history" spanning more than a decade, explaining a calendar year test "provides the firmest statutory footing for the Commission's major purpose determination—and is consistent with the FECA's plain language." The OGC concluded at least 76.5 percent of AJS's total spending for the 2010 calendar year went to federal campaign activity. As a result, the OGC concluded, AJS's spending showed the group's major purpose during 2010 was federal campaign activity.

34. Despite the detailed analysis of the AJS Report, on June 24, 2014, the Commission by a vote of three to three failed to find reason to believe AJS had violated 52 U.S.C. §§ 30102, 30103, and 30104, and by a vote of six to zero closed the file.

35. On July 30, 2014, the FEC released the statement of reasons of the three commissioners voting against finding "reason to believe"—then Chairman Lee E. Goodman and Commissioners Caroline C. Hunter and Matthew S. Petersen ("Goodman, Hunter, Petersen AJS SoR"). These commissioners, "[a]s the controlling decision makers," concluded AJS's major purpose, as "an organization that has spent less than ten percent of its funds on express advocacy during its entire existence . . . [was an] issue-advocacy organization [and] cannot be regulated as a political committee."

36. To reach that conclusion, the Goodman, Hunter, Petersen AJS SoR interpreted the First Amendment and judicial precedent to require the FEC to ignore AJS's communications that did not contain express advocacy, and to treat all such non-express advocacy communications, including AJS's electioneering communications, as not indicative of a purpose to nominate or elect candidates. The Goodman, Hunter, Petersen AJS SoR further interpreted the Buckley's "major purpose" limitation as considering the group's activities over its entire life and treating all such activity as equally important to determine whether the group's current major purpose was to nominate or elect candidates.

37. On August 20, 2014, Plaintiffs filed suit against the FEC alleging the FEC's dismissal of Plaintiffs' administrative complaint against AJS was "contrary to law," in violation of 52 U.S.C. § 30109(a)(8)(C).

38. On September 19, 2016, Judge Christopher R. Cooper found the FEC's dismissal of Plaintiffs' complaint against AJS was contrary to law and granted Plaintiffs' motion for summary judgment. *CREW v. FEC*, 209 F. Supp. 3d 77 (D.D.C. 2016). Specifically, Judge Cooper ruled that the FEC's controlling commissioners, as explained in the Goodman, Hunter, Petersen AJS SoR, committed legal error by concluding that the "First Amendment effectively required the agency to exclude from its consideration all non-express advocacy in the context of disclosure." *Id.* at 93.

39. Judge Cooper further found that the Goodman, Hunter, Petersen AJS SoR's "refusal to give any weight whatsoever to an organization's relative spending in the most recent calendar year—particularly in the case of a fifteen-year-old organization like AJS—indicates an arbitrary 'fail[ure] to consider an important aspect of the [relevant] problem.'" *Id.* at 94 (quoting *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 658 (2007)). Accordingly, Judge

Cooper reversed the dismissal of Plaintiffs' complaint against AJS and remanded for reconsideration within thirty days, to be made in conformity with the Court's declaration. *Id.* at 95.

40.     The Court's thirty-day deadline expired on October 19, 2016. As of that deadline, the Commission had neither informed Plaintiffs nor the Court of any action it had taken on the AJS matter beyond the Commissioners deadlocking on the question of whether to appeal Judge Cooper's decision.

41.     On November 14, 2016, Plaintiffs filed suit in district court challenging the FEC's constructive dismissal of or failure to act on CREW's administrative complaint. This case was docketed as Case No. 1:16-cv-2255.

42.     As part of a motion for summary judgment and pursuant to a protective order, the FEC provided the Plaintiffs with additional information.

43.     On the basis of the FEC's representations, Plaintiffs agreed to dismiss their claims against Respondents without prejudice. *See* Joint Stipulation of Dismissal, *CREW v. FEC*, Case No. 1:16-cv-2255, ECF 44 (Jan. 5, 2018).

44.     On March 20, 2018, Plaintiffs submitted an amended administrative complaint to the FEC against Respondents. A copy of the amended administrative complaint is attached as Exhibit 1. The amended administrative complaint served solely to supplement the complainants listed in CREW's original Complaint by substituting CREW's current Executive Director, Noah Bookbinder, for its prior Executive Director, Melanie Sloan. With respect to the allegations against the Respondent, the amended administrative complaint was identical to the original administrative complaint.

45.     The FEC has not yet sent CREW an acknowledgement following receipt of the

amended administrative complaint.

46. On April 3, 2018, counsel for CREW contacted counsel for the FEC to inquire about the status of the FEC's formal acknowledgement letter. Counsel for the FEC confirmed receipt of the amended administrative complaint and stated that "an acknowledgement letter concerning the AJS matter" would arrive "in the near future."

47. To date, CREW has not received an acknowledgement letter from the FEC regarding the amended administrative complaint, and a June 26, 2018 email to counsel for the FEC regarding this issue has not yet received a response.

48. As of the date of this filing, the FEC has not reached or made public a final decision on MUR 6538R, over six years after receiving the initial administrative complaint, nearly two years after Judge Cooper's decision remanding the initial complaint to the FEC, and more than 120 days following the filing of the amended administrative complaint.

49. Multi-year delays in acting on a pending complaint are not uncommon at the FEC, leading one FEC commissioner to express concern that "[e]ffective enforcement of the law is undermined by pervasive delays." *In the Matter of American Conservative Union, et al.*, Statement of Reasons of Comm'r Weintraub, MUR 6920, (Dec. 19, 2017), *available at* http://bit.ly/2CDnumJ.

50. The pervasive delays also often serve as a cause for other FEC commissioners to halt enforcement actions. For example, on May 23, 2011, CREW filed a complaint with the FEC alleging that the Commission on Hope, Growth and Opportunity ("CHGO") violated the FECA by spending more than $2.3 million to broadcast television ads in 12 elections for seats in the House of Representatives. Despite the nature and extent of the spending, CHGO failed to file disclosures as required by the FECA and failed to register as a political committee, which CREW

alleged constituted violations of the FECA. *In the Matter of The Commission on Hope Growth and Opportunity*, Complaint, MUR 6471 (May 23, 2011), *available at* http://bit.ly/2qHA6aL. The complaint languished before the FEC, with months and even years passing between actions. *See id.*, Summary, *available at* http://bit.ly/2o52aBt. Finally, in November 2015, more than four years after CREW filed its complaint, three controlling commissioners voted to exercise their discretion to dismiss the case and close the file without finding reason to believe that there was a violation of the FECA, in part because the "statute of limitations [had] effectively expired." *Id.*, Statement of Reasons of Comm'rs Petersen, Hunter, and Goodman, MURs 6391 and 6471 (Nov. 6, 2015), *available at* http://bit.ly/2D8LW0m. CREW has since brought suit challenging this dismissal as contrary to law, and litigation is ongoing. *See CREW v. FEC*, Case No. 17-5049 (D.C. Cir. June 15, 2018) (panel decision upheld dismissal but deadline for rehearing has not yet passed and mandate has not yet issued).

51. Similarly, on February 27, 2015, CREW filed a complaint against American Conservative Union, Now or Never PAC, James C. Thomas III, and Unknown Respondent alleging legal violations stemming from a failure to disclose the true source of a $1.71 million contribution to Now or Never PAC. *In the Matter of American Conservative Union, et al.*, Complaint, MUR 6920 (Feb. 27, 2015), *available at* http://bit.ly/2D6UHI7. OGC investigated the allegations and recommended finding reason to believe the respondents violated the FECA. *Id.*, First General Counsel's Report (Jan. 20, 2016), *available at* http://bit.ly/2swd1sQ. That report, however, sat before the commissioners for a full year, and by the time the FEC was willing to move forward on the matter it was "just about out of time" with regard to the statute of limitations. *Id.*, Statement of Reasons of Comm'r Weintraub (Dec. 19, 2017), *available at* http://bit.ly/2CDnumJ.

52.     While the FEC eventually found reason to believe that certain respondents violated the FECA, resulting in a $350,000 fine, the controlling commissioners ultimately declined to pursue investigation and enforcement against other unknown respondents who were either the true source of the contribution or also acted as a conduit, justifying this decision in large part due to the impending statute of limitations. *Id.*, Statement of Reasons of Comm'rs Hunter and Goodman (Dec. 20, 2017), *available at* http://bit.ly/2CTqQ8q. The decision not to pursue further investigation constituted "an egregious example of someone using a web of organizations to hide the true source of a $1.7 million contribution to a super PAC — and getting away with it." *Id.*, Statement of Reasons of Comm'r Weintraub (Dec. 19, 2017). CREW has since brought suit challenging the FEC's dismissal of the complaint against the other unknown respondents as contrary to law. *See CREW v. FEC*, Case No. 1:17-cv-2770 (D.D.C.) (ABJ) (litigation ongoing).

53.     Such delays commonly impact the FEC's ability to carry out its enforcement function, as documents may be destroyed or lost and witness memories may fade. In addition, the running of the five-year statute of limitations constrains the FEC's enforcement, as after the statute has run, it can no longer issue fines.

54.     These delays also hamper CREW's ability to access the information that it is entitled to under the statute. Furthermore, to the extent evidence is lost or degraded during a multi-year delay at the FEC, the delay undermines CREW's ability to litigate under the FECA should CREW file a suit alleging that an FEC final action is contrary to law.

**CAUSE OF ACTION**

(FEC Inaction Contrary to Law)

55. Plaintiffs re-allege and incorporate by reference all preceding paragraphs as if fully set forth herein.

56. The FEC first received CREW's complaint against AJS and Stephen DeMaura on March 8, 2012, more than six years ago.

57. In the intervening six years, CREW has brought two separate lawsuits regarding this administrative complaint. One, which resulted in a ruling that the FEC's dismissal of the complaint was contrary to law, remanded the administrative complaint back to the FEC for further action nearly two years ago, and the second challenged the FEC's failure to act on the remanded complaint.

58. Plaintiffs' administrative complaint and amended administrative complaint credibly alleged violations of FECA and FEC regulations by Respondents.

59. The FEC has failed to act in a timely manner on the administrative complaint following remand and on the amended administrative complaint. To date, the FEC has not reached a resolution of the matter or disclosed taking any action on the administrative complaint or amended administrative complaint since filing an affidavit in November 2017.

60. Sufficient time has elapsed to allow the FEC to conduct an investigation of MUR 6538R. The FEC's failure to act on the administrative complaint is unreasonable and contrary to law under 52 U.S.C. § 30109(a)(8), and the Court may compel the FEC to act.

61. Any party aggrieved by the failure of the FEC to act on an administrative complaint may petition the Court for a declaration that the failure is unlawful and for an order that the FEC conform with this declaration within 30 days. 52 U.S.C. § 30109(a)(8).

62. Action by the FEC on MUR 6538R may result in the FEC compelling AJS to register as a political committee and file the required information disclosures. If the FEC determines that any of the Respondents acted knowingly and willfully, it may make a referral to the Department of Justice for investigation into possible criminal penalties.

63. Plaintiffs have been harmed by the FEC's failure to act on the administrative complaint and amended administrative complaint. The FEC's failure to act has allowed AJS to continue to keep confidential information that, under the FECA, it was required to disclose. This failure to disclose information to which Plaintiffs are entitled hinders CREW in its programmatic activity and hinders Mr. Bookbinder in his ability to review campaign finance information.

64. Thorough investigation of administrative complaints and timely action by the FEC in making a final determination is in the public interest, and the FEC should rule on Plaintiffs' administrative complaint without further delay.

## **REQUESTED RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

(1) Declare that the FEC's failure to act on Plaintiffs' Amended Complaint (MUR 6538R) is contrary to law;

(2) Order the FEC to act on the Amended Complaint within 30 days, pursuant to 52 U.S.C. § 30109(a)(8)(C); and

(3) Grant such other and further relief as the Court may deem just and proper.

Respectfully submitted,

_/s/ Stuart McPhail_____
Stuart McPhail
(D.C. Bar No. 1032529)
Adam J. Rappaport
(D.C. Bar No. 479866)
Citizens for Responsibility and Ethics
  in Washington
455 Massachusetts Ave., N.W.
Washington, DC 20001
Phone: (202) 408-5565
Fax: (202) 897-1996
smcphail@citizensforethics.org